UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JAMES P. BOYLE,

                  Plaintiff,

    -vs-

MERRILL LYNCH,

                  Defendant.

_____

**DECISION AND ORDER**
**No. 10-CV-6520(MAT)**

## INTRODUCTION

Plaintiff James P. Boyle ("Boyle" or "Plaintiff"), represented by counsel, brings this action pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12201 et seq. ("ADA"), and the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq. ("HRL"), alleging that his former employer, Merrill Lynch ("Merrill Lynch" or "Defendant") discriminated against him, subjected him to a hostile work environment, failed to accommodate his disability, retaliated against him, and constructively discharged him because of his disability (Dkt. No. 1).

Defendant moves for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"), seeking dismissal of Plaintiff's complaint in its entirety. Plaintiff opposes the motion. For the reasons set forth below, Defendant's motion is granted, and Plaintiff's complaint is dismissed in its entirety with prejudice.

## BACKGROUND

The following facts are gleaned from the parties' submissions (Dkt. Nos. 32, 33, 34, 38, 39), including their respective Local Rule 56.1 Statements. Unless otherwise noted, the facts below are undisputed.

### Plaintiff's Employment History at Merrill Lynch

Plaintiff worked as a financial advisor ("FA") for Merrill Lynch in Rochester, New York from January 1985 until his resignation in July 2009. Prior to his resignation, Plaintiff had been in negotiations with a competitor firm, Brighton Securities. In a letter dated May 20, 2009, Brighton Securities extended to Plaintiff an offer of employment, including a $100,000 signing bonus, which he accepted in June 2009, before resigning from Merrill Lynch on July 2, 2009.

### Plaintiff's Depression

In 1997, Plaintiff was diagnosed with depression with paranoid features by Dr. Katherine Flannery, who treated Plaintiff from December 1996, through December 1998.  In May 1997, while using the Merrill Lynch office copy machine to make copies of personal notes, Plaintiff left a piece of paper in the copy machine that referenced his desire to commit suicide. Shortly thereafter, Plaintiff's then-manager Mary Kennemur ("Kennemur") met with Plaintiff to discuss the note. At that meeting, Plaintiff signed a form authorizing Merrill Lynch's Employee Assistance Program ("EAP") to consult with Dr. Flannery.

Following his meeting with Kennemur, Plaintiff met once with a psychiatrist of Defendant's choosing, took a five week leave of absence, and continued to consult with the EAP on a monthly basis for approximately one year.  From 1999 through August 2006, Plaintiff received treatment from a number of mental health providers, but he did not receive sustained treatment from any one individual because he could not find a provider with whom he felt comfortable.

From August 2006, through July or August 2009, Plaintiff treated with psychiatrist Dr. Brenda Bremer.  Dr. Bremer never spoke to anyone at Merrill Lynch about Plaintiff and never provided Merrill Lynch with any documentation regarding his condition. At the time she stopped treating Plaintiff in 2009, Dr. Bremer diagnosed Plaintiff with major depressive disorder; dysthymic disorder; personality disorder, not otherwise specified, with self-defeating narcissistic traits.  Plaintiff did not submit any medical information to Defendant regarding his depression, claiming that he did not do so because he believed that his managers were aware of his depression.  However, his managers (Jeffrey Adams ("Adams"), Chandler Root ("Root"), and Michael Fullen ("Fullen")) all testified that they were unaware Plaintiff suffered from depression.

**Plaintiff's Phone Conversations With Sears**

In December 2007, Plaintiff called Merrill Lynch Division Diversity Manager Todd Sears ("Sears") to complain about Merrill

Lynch's refusal to mediate with him in 2005 with respect to a FINRA claim that, according to Plaintiff, resulted in the unlawful debiting of his paycheck.  Plaintiff did not identify himself, but Sears learned Plaintiff's identity either through caller ID or through documentation later provided to him by Plaintiff.  During this call, Plaintiff informed Sears that he had a disability. Sears, in turn, referred Plaintiff to resources on Merrill Lynch's intranet site and suggested that he reach out to Chris Fossil ("Fossil"), the head of the company's internal network focused on employees with disabilities.

When Plaintiff called Sears a second time, he told Sears that he had attempted to contact Fossil, who had not returned his calls. Plaintiff reiterated the FINRA mediation issue which he believed had not been resolved in a fair manner. The parties dispute the substance of the ensuing conversation.  According to Defendant, just before the end of the call, Plaintiff informed Sears that he had a gun in his desk.  Sears then ended the conversation and told Plaintiff that he would need to bring Plaintiff's statements to the attention of the Human Resources department ("HR").  Plaintiff denies telling Sears that he had a gun in his desk. According to Plaintiff, he conveyed to Sears that Merrill Lynch should have a policy that relates to due process. In so doing, he referenced the Second Amendment (of the United States Constitution) in the context of defending oneself because of the right to bear arms.

Following the second conversation with Plaintiff, Sears contacted both HR and Root, Plaintiff's then-manager and the director of the complex where Plaintiff worked. On December 20, 2007, Plaintiff met with Root, Fullen and Joanne McGinlay ("McGinlay") of HR, at which time Plaintiff denied owning a gun or implying that he had one. Plaintiff insisted that he was merely invoking his right to bear arms as an example in the context of explaining why he needed to defend himself against Merrill Lynch for debiting his paycheck and refusing to mediate with him with respect to the FINRA claim.

Following the meeting, Plaintiff was provided with a "Meeting Summary Follow-Up" dated January 22, 2008 ("the Memo"), instructing Plaintiff to be mindful of the language he used in the workplace. The Memo reminded Plaintiff that he could pursue concerns about the mediation issue related to the FINRA claim with Defendant's EDR Program, and it provided Plaintiff with resources for any concerns he had related to disability-based discrimination.

**Re-Assignment of Accounts in 2008 and 2009**

Pursuant to Merrill Lynch's redistribution policy, when an FA leaves Merrill Lynch, his or her accounts are redistributed to other FAs based on their ranking. FAs have the discretion to accept or reject accounts distributed to them pursuant to this policy. Plaintiff asserts that accounts were distributed without conforming to the company's redistribution policy. He also claims

that management has the discretion to assign accounts to specific FAs and bypass the company policy.

In 2008 and 2009, William Page ("Page"), a Merrill Lynch service support supervisor in Rochester, was responsible for distributing accounts left by departing FAs.  Page claims he redistributed accounts, including several to Plaintiff, pursuant to the redistribution policy.

In July 2008, Jeffrey Adams ("Adams") became Plaintiff's manager, and, at some point thereafter, Plaintiff asked Adams to review how client accounts had been re-assigned to him because he felt it was not being done correctly. Adams was not directly involved in reassigning accounts to Plaintiff, and instructed either his administrative manager or client relationship manager to investigate Plaintiff's concerns.  During the time Adams was Plaintiff's manager, Plaintiff claims he received four accounts that he considered to be "troubled."  Although Plaintiff could have rejected the accounts, he chose not to do so.

**Creation of Teams of FAs**

In January or February 2009, Plaintiff met with Adams to discuss Plaintiff's business plan for 2009. Plaintiff asked if Adams would help him form a team with one or more other FAs but did not explain to Adams why he wanted to be on a team. It was the responsibility of the FAs to find colleagues who were interested in forming a team with them.  After FAs had agreed to work together as a team, they would submit a proposed team agreement addressing

various issues to management.  When Plaintiff asked Adams for help forming a team, Adams informed Plaintiff that it was his own responsibility to speak to other FAs about forming or joining a team.  After Plaintiff's discussion with Adams in January or February 2009, the two had no further discussions about forming a team before Plaintiff resigned in July 2009.

**The Anonymous Call from a "Client" in June 2009**

In June 2009, Page and Adams learned from a client associate that someone claiming to be a client of Plaintiff's had called Merrill Lynch in regards to a packet that he had received requesting that he move his account to Brighton Securities because Plaintiff was leaving Merrill Lynch.  Adams was unable to confirm that the caller indeed was a Merrill Lynch client. He and Page spoke to Plaintiff about the incident on or about June 12, 2009. Plaintiff denied that he had plans to leave Merrill Lynch. Plaintiff requested that Adams reveal the identity of the caller, but Adams was unable to do so because the call had come in anonymously.

At the time of his conversation with Page and Adams, he had already received an offer of employment with a $100,000 signing bonus from Brighton Securities, and he had committed to joining that firm. According to Plaintiff, although he had committed to joining Brighton Securities prior to leaving Merrill Lynch, he did not enter into an actual agreement of employment with Brighton Securities until after he submitted his resignation to Merrill

Lynch on July 2, 2009.   Plaintiff later learned through his own investigation that the anonymous caller was a manager and part owner of Brighton Securities who did not want Plaintiff to join the firm.   **Plaintiff's Resignation and the EEOC Charge**

On July 2, 2009, Plaintiff submitted his resignation letter to Merrill Lynch. Through its attorneys, Merrill Lynch sent Plaintiff a letter dated July 7, 2009, reminding him of his obligations under his employment agreement with Merrill Lynch.

On September 10, 2009, Plaintiff filed an administrative charge with the Equal Employment Opportunity Commission ("EEOC") alleging that Merrill Lynch had discriminated and retaliated against him, subjected him to a hostile environment, and constructively discharged him, on the basis of his alleged disability. This civil action followed.

## DISCUSSION

### I.   Defendant's Motion for Summary Judgment

Pursuant to Rule 56, a court shall grant a motion for summary judgment if the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).   A plaintiff can defeat a motion for summary judgment by "com[ing] forward with evidence to allow a reasonable jury to find in his favor" on each of the elements of his prima facie case. See Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir. 2001); Celotex Corp. v. Catrett, 477 U.S. 317, 325-27 (1986). The court must draw all factual

inferences, and view the factual assertions in materials such as affidavits, exhibits, and depositions, in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Celotex Corp., 477 U.S. at 322.   However, a nonmovant benefits from such factual inferences "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (quotation omitted).   The law is well established that "conclusory statements, conjecture, or speculation" are insufficient to defeat a motion for summary judgment. Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996).   The nonmovant cannot survive summary judgment simply by proffering "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), or presenting evidence that "is merely colorable, or is not significantly probative." Savino v. City of New York, 331 F.3d 63, 71 (2d Cir. 2003) (quoting Anderson, 477 U.S. at 249-50 (citation omitted)).   Rather, he must "set out specific facts showing a genuine issue for trial." Anderson, 477 U.S. at 248, 250.

## II. Administrative Exhaustion with Respect to Plaintiff's ADA Claims

It is well-settled that an ADA plaintiff must exhaust his administrative remedies before commencing an action in federal court. J.C. v. Regional School Dist. 10, Bd. of Educ., 278 F.3d 119, 124 (2d Cir. 2002). Defendant argues that Plaintiff failed to exhaust his ADA claim because, in his EEOC complaint, he did not

assert that Merrill Lynch failed to provide him with reasonable accommodations for his disability.   Dkt. No. 33, Ex. J; Dkt. No. 39, Ex. J.

Plaintiff concedes that he did not set forth a claim for failure to provide reasonable accommodations, but argues that a failure to accommodate claim is "reasonably related" to the claims that were included in the EEOC charge because "[he] explicitly referred in his EEOC complaint to denial of his requests for assistance" and because "[h]is EEOC complaint also names Jeff Adams as a prime discriminator."   Dkt. No. 37 at 9.   "The exhaustion requirement is relaxed under the 'reasonably related' doctrine if, inter alia, the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Mathirampuzha v. Potter, 548 F.3d 70, 76 (2d Cir. 2008) (citation omitted).

While the record reflects that Plaintiff did refer to "requests for assistance" in his EEOC charge (Dkt. No. 39, Ex. J at 3),[1] he did not indicate what his requests were or situate his requests in the context of a need for accommodating a disability. Similarly, although Plaintiff's EEOC charge mentions his then-manager Adams several times, it does not do so in reference to Adams's failure to accommodate Plaintiff's disability. Plaintiff specifically references Adams in the following contexts in his EEOC charge: the assignment of troubled accounts to Plaintiff; the

---

[1]     The Court refers to the CM/ECF pagination here.

anonymous call regarding Plaintiff's employment with Brighton Securities; and the departure of Plaintiff's assistant. Accordingly, Plaintiff's failure to accommodate claim cannot be considered "reasonably related" to the conduct complained of in the EEOC charge. See Matirhampuzha, 548 F.3d at 76 (finding that retaliation and hostile work environment claims were not reasonably related to EEO complaint, which only referenced one instance of defendant acting aggressively toward plaintiff; "[n]owhere did the plaintiff assert or imply a retaliatory motive for [defendant]'s conduct, nor did he indicate that he had been verbally harassed in the past, denied lunch breaks and assistance in performing his work duties, or otherwise subjected to a hostile work environment"). The Court therefore finds that the ADA claim is unexhausted.

## II. Timeliness of Plaintiff's ADA and HRL Claims

For purposes of the ADA, a charge of discrimination must be filed with the EEOC within 300 days of the alleged discrimination. See 42 U.S.C. § 2000e-5(e); 42 U.S.C. § 12117(a); Harris v. City of New York, 186 F.3d 243, 247 n. 2 (2d Cir. 1999). With regard to the HRL, the applicable statute of limitations is three years. Greene v. Trustee of Columbia Univ., 234 F.Supp.2d 368, 377 (S.D.N.Y. 2002) (citing N.Y. CIV. PRAC. L. & R. § 214).

Applying these limitations periods, the Court finds that the only timely claims for ADA purposes are those arising on or after November 14, 2008. The only timely claims for for HRL purposes are those arising on or after September 20, 2006.   The Court notes

that this date takes into account the tolling period from September 9, 2009 (when the EEOC charge was filed), to August 31, 2010 (when the Right to Sue Letter was issued). See DeNigris v. New York City Health and Hospitals Corp., 861 F.Supp.2d 185, 192 (S.D.N.Y. 2012) (three-year limitations period is tolled "for the period between the filing of an EEOC charge and the issuance by the EEOC of a right-to-sue letter.") (citation omitted)).

Defendant has characterized a portion of Plaintiff's argument as suggesting that his timely constructive discharge and failure to accommodate claims save all of his untimely ADA and HRL claims. See Dkt. No. 37 at 9-11. However, it appears to the Court that Plaintiff has conceded the timeliness issue but asserts that the evidence from the time-barred actions is admissible to prove discrimination, retaliation, failure to accommodate, hostile work environment, and constructive discharge. Id. at 10-11 (citing cases standing for proposition that there is no statute of limitations on evidence). The cases Defendant cites in opposition to Plaintiff's argument deal with "[t]he continuing violation exception[,]" which "applies when there is evidence of an ongoing discriminatory policy or practice, such as use of discriminatory seniority lists or employment tests." Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 712 (2d Cir. 1996). If the plaintiff can show a continuing violation, he is entitled to have the court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time

barred." Id. This theory, however, requires that the employer have a discriminatory policy or mechanism. Lukasiewicz-Kruk v. Greenpoint YMCA, 404 F. App'x 519, 520 (2d Cir. 2010). "[M]ultiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir. 1993), abrogated on other grounds, Kasten v. Saint-Gobain Performance Plastics Corp., 131 S. Ct. 1325, 1336 (2011); see also National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.").

Here, there is no allegation of a discriminatory policy or mechanism in place at Merrill Lynch, and there is no basis in the record for inferring the existence of such a policy. Based on this record, Plaintiff cannot avail himself of the continuing violation theory. Plaintiff's constructive discharge and remaining failure to accommodate claims cannot save the remainder of Plaintiff's untimely claims. The issue of whether the evidence of the untimely claims is admissible as background in support of Plaintiff's timely claims is moot, given that this Court is dismissing Plaintiff's complaint.

### III. Plaintiff has Failed to Establish a Prima Face Case with his Respect to His Remaining Failure to Accommodate Claim

Plaintiff's only surviving failure to accommodate claim is that Adams refused to help him form a team with other FAs in February 2009. Because "the legal standards for discrimination and retaliation claims under the [New York State] Human Rights Law are analytically identical to claims brought under the ADA," Plaintiff's failure to accommodate, discrimination, hostile work environment, and retaliation claims under the ADA and HRL are subjected to the same analysis. Parinello v. Bausch & Lomb, 2013 WL 1680152, at *13 (W.D.N.Y. Apr. 17, 2013). To establish a reasonable accommodation claim under the ADA, a plaintiff must show that "(1) [he] is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, [he] could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." Graves v. Finch Pruyn & Co., Inc., 457 F.3d 181, 184 (2d Cir. 2006) (citations omitted).

Even assuming arguendo that Plaintiff meets the first two elements, Defendant argues, he has failed to establish that working on a team of other FAs was needed for him to perform the "essential functions" of his job as an FA. As an initial matter, the undisputed evidence in the record shows that while Plaintiff told Adams he wished to work on a team, he did so only in the context of explaining his business plan and goals for the upcoming year.

-14-

Plaintiff did not inform Adams that working on a team with other FAs was necessary for him to do his job as an FA. However, the law is clear that "'it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.'" Graves, 457 F.3d at 184-85 (quoting 29 C.F.R. pt. 1630, app. at 363 (2003); citing Flemmings v. Howard Univ., 198 F.3d 857, 861 (D.C. Cir. 1999) ("An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation . . . ."). Furthermore, while the record shows that Plaintiff disclosed his depression to some of his managers between 1997 and 2009, there is no evidence to suggest that Adams, in particular, knew or should have known of Plaintiff's depression in February 2009, in the context of Plaintiff's specific need for a team-setting accommodation in order for him to perform his job as an FA.

Nonetheless, Plaintiff points to Dr. Bremer's testimony that "making it possible for Plaintiff to work as a part of a team may have lessened the effect of Plaintiff's disability on his ability to function in the workplace[.]" Dkt. No. 39, Ex. 4 at 60. While this may have been true, the law certainly "does not obligate [an] employer to meet the personal preferences of disabled employees." Raffaele v. City of New York, 2004 WL 1969869, at *17 (E.D.N.Y. Sept. 7, 2004). Moreover, Plaintiff has ignored Dr. Bremer's testimony indicating that, given Plaintiff's mental issues and his "difficulty getting along with other people[,]" "he might have had

-15-

difficulty relating effectively" if he worked on a team.  <u>Id.</u>
Plaintiff also neglects to mention that, when asked during her
deposition if she "ever discuss[ed] with [Plaintiff] a request he
made to Merrill Lynch to work as a part of a team of brokers rather
than as an isolated individual[,]" Dr. Bremer replied, "I don't
remember him bringing that up." <u>Id.</u> at 59.

As a final matter, the Court notes Plaintiff's heavy focus on
Defendant's purported "duty" to engage in an interactive process
with him concerning his disability-related needs.  Dkt. No. 37 at
11-14.  Because, however, the Court finds plaintiff has not
established a <u>prima facie</u> case of discrimination under the ADA, it
need not discuss the sufficiency of the interactive process.
<u>See</u> <u>McBride v. BIC Consumer Prods. Mfg. Co.</u>, 583 F.3d at 100-01
(2d Cir. 2009) (noting an insufficient interactive process, without
more, does not establish a <u>prima facie</u> case of discrimination under
the ADA).

## IV. Plaintiff has Failed to Establish a <u>Prima Facie</u> Case of Disability Discrimination

There are four elements that a plaintiff must show to make out
a prima facie case of discrimination under the ADA: "(1) his
employer is subject to the ADA; (2) he was disabled within the
meaning of the ADA; (3) he was otherwise qualified to perform the
essential functions of his job, with or without reasonable
accommodation; and (4) he suffered adverse employment action

because of his disability." Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001) (quotation and citation omitted).

For purposes of this motion for summary judgment, Defendant concedes that Plaintiff is subject to the ADA and HRL, is disabled within the meaning of the ADA and the HRL, and that was qualified to perform his job as an FA. Defendant, however, asserts that Plaintiff cannot establish that Merrill Lynch subjected him to any adverse employment action because of his disability. Dkt. No. 35 at 13.

To constitute an adverse employment action in violation of the ADA, there must be a "materially adverse" change in working conditions. Patrolmen's Benevolent Ass'n of City of New York v. City of New York, 310 F.3d 43, 51 (2d Cir. 2002), cert. denied, 538 U.S. 1032 (2003). A materially adverse change "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Crady v. Liberty Nat'l Bank and Trust Co., 993 F.2d 132, 136 (7th Cir. 1993) (quoted in Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)). Examples of materially adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Id. "The key . . . is that the plaintiff must show that the [employer's action]

-17-

created a 'materially significant disadvantage.'" <u>Galabya</u>, 202 F.2d at 64 (quoting <u>Harlston v. McDonnell Douglas Corp.</u>, 37 F.3d 379, 382 (8th Cir. 1994)).

Plaintiff counters that he suffered the following adverse employment actions: (1) Fullen, the Administrative Manager in charge of Risk and Compliance, questioned Plaintiff about some of his trades; (2) Adams failed to meet with Plaintiff in a one-on-one setting for the first three months after Adams began working as Plaintiff's manager in July 2008; (3) Adams refused to help Plaintiff form a team of FAs in 2009; (4) Plaintiff was assigned troubled accounts in 2008 and 2009; (5) Merrill Lynch management failed to inform Plaintiff at the same time as other FAs that his assistant was out sick one day in January 2009, and who would replace his assistant when she left Merrill Lynch in February 2009; and (6) Plaintiff was constructively discharged.

With respect to the first five complained-of actions set forth in the preceding paragraph, Plaintiff has not shown that any of these incidents negatively affected his pay, benefits, or position as an FA at Merrill Lynch. Therefore, they do not constitute adverse actions.  Furthermore, the fact that he allegedly was subjected to what he deems excessive scrutiny about some of his accounts is not sufficient, in and of itself, to constitute an adverse action. <u>See</u> <u>Hill v. Rayboy-Brauestein</u>, 467 F. Supp.2d 336, 355 (S.D.N.Y. 2006) (collecting cases). Additionally, the Court

notes that the slights or inconsiderate behavior Plaintiff experienced on the part of management with respect to the particular actions set forth at (2) and (5), do not, as a matter of law, constitute adverse employment actions. See Kaplan v. Multimedia Entertainment, Inc., No. 03-CV-0805C(F), 2008 WL 686774, at *5 (W.D.N.Y. Mar. 10, 2008) (petty slights, minor annoyances, and lack of good manners are not actionable "adverse actions") (citing Burlington N. & Sante Fe Ry. Co., 548 U.S. 53, 126 S. Ct. 2405, 2415 (2006)).

Plaintiff fares no better with his sixth allegation, namely, that he suffered an adverse employment action when he was constructively discharged from Merrill Lynch. He maintains that beginning in 1997, he endured a hostile work environment as a result of his depression, and that he was eventually forced to resign. As discussed infra, however, Plaintiff is unable to establish a successful constructive discharge claim, and thus cannot rely upon same to establish that he was subjected to an adverse employment action. See Delashmutt v. Wis-Pak Plastics, Inc., 990 F. Supp. 689, 697 (N.D. Iowa 1998) ("[I]f [plaintiff] cannot prove retaliation, because she cannot prove any adverse employment action, then she necessarily cannot prove her employer made her working environment so intolerable as to establish any independent constructive discharge claim.") (footnote omitted).

## IV.   Hostile Work Environment and Constructive Discharge Claims

Plaintiff argues that he was subjected to a hostile work environment, beginning in 1997 up through his resignation in 2009, because of his depression.  He claims that "representatives of defendant frequently urged him to quit his job", and he eventually did so because of this alleged harassment.  Dkt. No. 37 at 15-18.

Although the Second Circuit has not determined whether the ADA gives rise to a cause of action for hostile work environment, see Bonura v. Sears Roebuck & Co., 62 F. App'x 399, 400 n.3 (2d Cir. 2003), cert. denied, 540 U.S. 1113 (2004), district courts in this Circuit have held that such claims are cognizable. See, e.g., Hendler v. Intelecom USA, Inc., 963 F. Supp. 200, 208 (E.D.N.Y. 1997) (analyzing ADA hostile work environment claim under the same standard as Title VII hostile work environment claim); Hudson v. Loretex Corp., No. 95-CV-844 (RSP/RWS), 1997 WL 159282, at *2-3 (N.D.N.Y. Apr. 2, 1997) (same).

A plaintiff opposing summary judgment on a hostile work environment claim must produce evidence from which a reasonable trier of fact could conclude "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer."  Mack v. Otis

Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003) (quoting Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 436 (2d Cir. 1999)). "The sufficiency of a hostile work environment claim is subject to both subjective and objective measurement: the plaintiff must demonstrate that [he] personally considered the environment hostile, and that the environment rose to some objective level of hostility."   Leibovitz v. New York City Transit Auth., 252 F.3d 179, 188 (2d Cir. 2001) (citations omitted). "Courts look at all circumstances to ascertain whether an environment is sufficiently hostile or abusive to support a claim." Id. (citations omitted). Factors to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." Id. (citation omitted).

The isolated incidents that fall within the relevant statute of limitations period which constitute the allegedly hostile work environment are as follows:  (1) Defendant assigned him four troubled accounts; (2) Defendant refused to provide him information related to an anonymous caller who suggested that Plaintiff was leaving Merrill Lynch to work for a competitor; and (3) Defendant prevented Plaintiff from taking his rolodex and from soliciting Merrill Lynch clients after his resignation. Plainly, none of these incidents approaches conduct that could be deemed "harassment",

much less anything that is so "extraordinarily severe" as to
"create an objectively hostile or abusive work environment—an
environment that a reasonable person would find hostile or
abusive." Harris, 510 U.S. at 21. In particular, with regard to the
assignment of the four troubled accounts, Plaintiff had the option
to decline them, but he did not do so. Notably, the substance of
the anonymous phone call regarding Plaintiff's plans to relocate to
a competing firm was true. Plaintiff's assertion that Merrill Lynch
"harassed" him by preventing him from poaching their clients after
*he* made the decision to move to a competing firm is, frankly,
preposterous. While Plaintiff alleges that these incidents
negatively affected his mental well-being (Dkt. No. 37 at 18), a
reasonable person could not find the complained-of conduct to be
hostile or even offensive.

Plaintiff's related constructive discharge claim also fails.
To establish a constructive discharge, an employee bears a heavy
burden and must show that his employer deliberately made his
working conditions so intolerable that he was forced to resign.
Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 73
(2d Cir. 2000). The Second Circuit has held that a "constructive
discharge" cannot be established simply through evidence that the
"employee was dissatisfied with the nature of his  assignments,"
"the employee feels that the quality of his work has been unfairly
criticized," or "the employee's working conditions were difficult

or unpleasant." Stetson v. NYNEX Service Co., 995 F.2d 355, 360. Therefore, "a claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" Id. at 361 (quotation omitted).

Plaintiff claims that "representatives of defendant frequently urged him to quit his job." Dkt. No. 37 at 17. Even assuming this was true, he has not cited any relevant authority for his assertion that such conduct "is sufficient in and of itself to establish constructive discharge." Dkt. No. 37 at 17. Moreover, Plaintiff has identified only two time-frames (December 2007, and sometime in 2008) in which "representatives of defendant" allegedly told him to quit his job. Both of these time-frames are too remote from Plaintiff's resignation in July 2009, for any rational trier of fact to conclude that his eventual resignation was motivated at all by these alleged statements.

Plaintiff also asserts that he resigned on July 2, 2009 "at the suggestion of [his psychiatrist] Dr. Bremer in light of his deteriorating mental health." Dkt. No. 37 at 18. However, there is no other evidence in the record to corroborate this statement. In fact, it is contradicted by Dr. Bremer's deposition testimony that she had only "vague memories of talking about the potential

-23-

for looking for work elsewhere." Moreover, Dr. Bremer could only recall one occasion on which the issue was discussed with Plaintiff, who told her that he did not believe it was in his best interest to resign. Dkt. No. 39, Ex. 4 at 55-56. In any event, the evidence that Plaintiff was actively engaged in negotiations with a rival firm for nine months prior to his resignation, that he waited until he had secured an offer that included a $100,000 signing bonus before accepting, and that he accepted the offer before he tendered his resignation at Merrill Lynch completely undercuts his claim that his employment at Merrill Lynch was so "intolerable" so as to constitute a constructive discharge. See Wagner v. Sanders Assocs., Inc., 638 F.Supp 742, 746 (C.D. Cal. June 25, 1986) ("The undisputed fact that [plaintiff] remained in his new position for several months before resigning goes a long way toward destroying his assertion that the transfer created an intolerable situation. This Court must therefore conclude that on facts which are not in genuine dispute, [plaintiff] was not constructively discharged and cannot state any claim for constructive discharge.").

## VI.  Retaliation Claim

To plead a claim for retaliation under the ADA, a plaintiff must allege that: 1) the employee engaged in an activity protected by the ADA; 2) the employer was aware of the activity; 3) an employment action adverse to the plaintiff occurred; and 4) a

causal connection existed between the protected activity and the adverse action. Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999) (citations omitted). The Court assumes for purposes of this motion that Plaintiff meets the first two elements of the prima facie inquiry. However, he cannot meet the remaining prongs by showing that he suffered an adverse employment action causally connected to any protected activity.

Plaintiff's retaliation claim is based upon the following alleged adverse actions: (1) Defendant accused him of making reference to "getting a gun" and assigned him troubled accounts after he contacted Merrill Lynch's Bank Division Diversity Manager in December 2007; (2) Adams refused to help him form a team in 2009; and (3) Defendant sent him a letter on July 7, 2009, following his resignation, reminding him of his duties and obligations regarding Merrill Lynch customer records and information. "Actions are materially adverse if they are harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination [or retaliation]." Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010) (internal quotation marks omitted). The second contention is plainly not adverse. As discussed above, the onus was on the employee–not the manager–to form a team of FAs at Merrill Lynch, if the employee wanted to be part of an FA team. The fact that the reminder from Merrill Lynch came *after* his resignation prevents it from being

considered an adverse action that occurred during his employment at Merrill Lynch. Moreover, it is not adverse. With regard to the troubled accounts, as stated above, Plaintiff had the ability to decline the assignment but did not.

Finally, with respect to the alleged accusation of having a gun, Plaintiff completely mischaracterizes the Memo, which simply reminded Plaintiff to be aware of the language he used in the workplace. This cannot reasonably be deemed a reprimand or threat of disciplinary action. Even if Plaintiff had been reprimanded for stating he had a gun at work, this would not, standing alone, be sufficient to conclude he suffered an adverse employment action. Although reprimands and excessive scrutiny of an employee can contribute to a finding that an adverse employment action has taken place, see Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002), "courts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." Uddin v. City of N.Y., 427 F.Supp.2d 414, 429 (S.D.N.Y. 2006) (quotation omitted); see also Weeks v. New York State, 273 F.3d 76, 86 (2d Cir. 2001) ("It hardly needs saying that a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action."), abrogated on other grounds, National

R.R. Passenger Co. v. Morgan, 122 S. Ct. 2061, 2069-73 (2002). Here, it is undisputed that the Memo issued in regards to Plaintiff's statement that he had a gun was not accompanied by any demotion or decrease in pay. Therefore, it cannot as a matter of law constitute an adverse employment action.

### CONCLUSION

For the reasons set forth herein, Defendant's Motion for Summary Judgment is granted. Plaintiff's Complaint is dismissed in its entirety with prejudice.

**IT IS SO ORDERED.**

S/Michael A. Telesca

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    March 18, 2014
          Rochester, New York